E.W. BLISS COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 95–5103.

United States Court of Appeals,
Federal Circuit.

Feb. 23, 1996.

Richard A. Degen, Mascoutah, Illinois, argued, for plaintiff-appellant. With him on the brief was Robert a. Klimek, Jr., Klimek, Kolodney & Casale, P.C., Washington, D.C., of counsel.

William P. Donovan, Jr., Attorney, Commercial Litigation Branch, Department of Justice, of Washington, D.C., argued, for defendant-appellee. Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director and Dean L. Grayson, Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., were on the brief, for defendant-appellee. Also on the brief was Irvin Ansher, Office of the Chief Counsel, United States Mint, of counsel.

Before MAYER, Circuit Judge,
FRIEDMAN, Senior Circuit Judge, and
MICHEL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from a decision of the United States Court of Federal Claims that the appellant, E.W. Bliss Company (Bliss), an unsuccessful bidder on a government contract, cannot recover its bid preparation costs. *E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123 (1995). We affirm.

## I.

A. The United States Mint (Mint) issued a solicitation for proposals to refurbish and remanufacture the Mint's coin presses to incorporate the latest industrial standards and technology. *Id.* at 126. The request for proposals stated that the Mint would award the contract to the bidder whose offer would be most advantageous to the government, and specified that the Mint could accept other than the lowest offer. *Id.*

Following a pre-proposal conference with prospective bidders, the Mint issued Amendment No. 0001 to the solicitation in response to the following question there raised:

Q. How will we be able to determine if the crank shaft [sic] is good without disassembling the presses?

A. The proposal should address a new crankshaft to insure consistencies between the new remanufactured presses. All old components removed from the presses shall be returned to the Mint for use as spare parts.

*Id.* at 127.

Four bidders, including Bliss and the successful bidder, Pressmasters of Delaware Valley Inc. (Pressmasters), submitted proposals. The Mint's evaluation of the technical aspect of the proposals gave both Bliss and Pressmasters an "excellent" quality rating, although Bliss' average numerical score was slightly lower than Pressmasters'. *Id.* at 128. Based on this rating and a price analysis showing that Bliss' proposal was more costly, the Mint determined that "award to PRESSMASTERS provides the Best Value to the Government." *Id.* at 129.

In view of Amendment No. 0001, the Mint expected each bidder to install a new crankshaft in the presses, regardless of the condition of the old one. *Id.* at 138 & n. 4. Bliss' proposal explicitly so provided. *Id.* at 137. Pressmasters' proposal stated that "it would '[e]valuate all parts for remanufacture or replacement,'" *id.,* and only referred to a crankshaft in a section entitled "options," in conjunction with a recommendation for the installation of a new type of clutch and brake unit. *Id.* The Mint construed Pressmasters' proposal implicitly to provide for a new crankshaft, with the option simply indicating the availability of a different type of crankshaft. *Id.* at 131, 139–40. The parties do not dispute that Pressmasters "provided new crankshaft parts at no extra cost to the agency." *Id.* at 132.

B. Following the Mint's award of the contract to Pressmasters, Bliss filed a protest with the Comptroller General, which was denied. *Id.* Bliss then filed this action in the United States Court of Federal Claims, seeking "reimbursement of bid preparation costs and attorneys' fees based on the allegedly unlawful award to Pressmasters." *Id.* at 133.

On cross motions for summary judgment, the court granted summary judgment for the government, holding that the government's

award of the contract to Pressmasters was not arbitrary and capricious. *Id.* at 125. In a lengthy and detailed opinion that discussed each of Bliss' challenges to the award, the court concluded that although the procurement process was not entirely free of error, Bliss nevertheless failed to prove that under the totality of the circumstances, the award was unreasonable. *Id.* at 135–43.

Regarding the requirement for a new crankshaft, the court held Amendment No. 0001 to be ambiguous. *Id.* at 138. It ruled, however, that because the Mint's assumption that Pressmasters would supply a new crankshaft was not unreasonable, the ambiguity did not entitle Bliss to bid preparation costs. *Id.* at 140.

In rejecting Bliss' claim that the Mint erred in awarding the contract because Pressmasters' proposal was "materially non-responsive" to the solicitation because it did not provide for a new crankshaft, the court stated that " '[n]ot every regulation is established for the benefits of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors.' " *Id.* (quoting *Keco Indus., Inc. v. United States,* 492 F.2d 1200, 1206, 203 Ct.Cl. 566 (1974)). The court held that "[i]n the particular circumstances of this case, were the court to have found that the Mint accepted a nonresponsive proposal, the offeror's interest in having a competitor's proposal evaluated properly would have to be subordinated to the public's interest in an efficiently and inexpensively administered procurement process." *E.W. Bliss Co.,* 33 Fed.Cl. at 141.

## II.

The theory on which an unsuccessful bidder is awarded its bid preparation costs is that the government violated its " 'implied contract to have the involved bids fairly and honestly considered.' " *CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir. 1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir. 1983) (in banc)). As our predecessor court explained:

> Proposal preparation expenses are a cost of doing business that normally are "lost" when the effort to obtain the contract does not bear fruit. In an appropriate case, however, a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious. The standards that permit a disappointed competitor to recover proposal preparation expenses are high and the burden of proof is heavy.

*Lincoln Servs., Ltd. v. United States,* 678 F.2d 157, 158, 230 Ct.Cl. 416 (1982); *see also CACI, Inc.,* 719 F.2d at 1573; *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir. 1983) ("The theory upon which a contractor may recover bid preparation costs is that the government had breached an implied contract, obligating it 'to treat a bid honestly and fairly,' because its 'conduct was arbitrary and capricious toward the bidder-claimant.' ") (quoting *Keco Indus., Inc.,* 492 F.2d at 1203, 1205); *Tackett & Schaffner, Inc. v. United States,* 633 F.2d 940, 942, 224 Ct.Cl. 530 (1980) ("[I]n order to recover, plaintiffs must show that the Government's actions were arbitrary and capricious and the standard of proof required is a high one."); *Excavation Constr., Inc. v. United States,* 494 F.2d 1289, 1290, 204 Ct.Cl. 299 (1974) (stating that recovery of bid preparation costs "is dependent upon a showing of arbitrary and capricious action by the Government").

In *Keco Indus., Inc.,* the court listed four subsidiary criteria that determine whether the government acted arbitrarily and capriciously in a bid preparation costs case:

> One is that subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal, normally warrants recovery of bid preparation costs. A second is that proof that there was "no reasonable basis" for the administrative decision will also suffice, at least in many situations. The third is that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. The fourth is that proven violation of pertinent statutes or regulations can, but need not necessarily be a ground for recovery. The applica-

tion of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor.

*Keco Indus., Inc.,* 492 F.2d at 1204 (citations omitted); *see also Burroughs Corp. v. United States,* 617 F.2d 590, 597–98, 223 Ct.Cl. 53 (1980) (applying *Keco Indus., Inc.* criteria).

### III.

In this appeal Bliss repeats the thirteen challenges to the award it unsuccessfully made in the Court of Federal Claims. The only one that warrants discussion is its contention relating to the bidder's obligation to furnish a new crankshaft in accordance with Amendment 0001.

■ A. Bliss first contends that if, as the Court of Federal Claims held, Amendment 0001 was ambiguous, any award based on that amendment was arbitrary and capricious and constituted a breach of the government's implied contract to consider its bid fairly and honestly. The Court of Federal Claims deemed the amendment ambiguous because the "requirement that proposals 'address a new crankshaft' is susceptible to two or more reasonable interpretations." *E.W. Bliss Co.,* 33 Fed.Cl. at 138. In so ruling, however, the court improperly focused on the single word "address," rather than looking at Amendment No. 0001 as a whole.

Read in context, the amendment unambiguously required the installation of a new crankshaft, without regard to the condition of the old one. The Mint issued the amendment in response to an inquiry from a prospective bidder as to how it could determine whether a new crankshaft would be required "without disassembling the presses," *id.* at 137, which could be undertaken only after a contract had been awarded. The Mint eliminated that uncertainty by requiring that "[t]he proposal should address a new crankshaft to insure consistencies between the new remanufactured presses." The Mint added (presumably to clarify the fate of the old crankshaft, which might still be in working order), that "[a]ll old components removed

from the presses shall be returned to the Mint for use as spare parts." *Id.*

When the requirement that the proposal "address a new crankshaft" is read in conjunction with the question to which it responded, it is apparent that the whole purpose of the amendment was to eliminate the very ambiguity that Bliss now claims exists. The Mint added the amendment to ensure that all proposals provided for a new crankshaft, thereby eliminating the need for disassembling the presses to determine the condition of the old crankshaft. Bliss itself, as well as the Mint, apparently had no difficulty in discerning the meaning of the amendment, since its proposal explicitly included a new crankshaft.

■ B. Bliss further argues that if the solicitation was unambiguous, the Mint improperly awarded the contract to Pressmasters, since Pressmasters' proposal did not conform to a material term of the solicitation because it did not provide for a new crankshaft.

■ "In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *In re Stocker & Yale, Inc.,* B–242568, 91–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 460, at 4 (May 13, 1991); *In re Briegert Aviation, Inc.,* B–222645, 86–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 419, at 3 (October 10, 1986). In order to obtain bid preparation costs, however, Bliss must show not only that the Mint committed such a violation, but also that the violation was sufficiently serious to constitute arbitrary and capricious action under the four *Keco* factors set out above. *See Keco Indus., Inc.,* 492 F.2d at 1204, 1206 ("[I]t may be that even a proven violation of some procurement regulation, in selecting the competitor, will not necessarily make a good claim. Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors."); *see also M.W. Kellogg Co./Siciliana Appalti Costruz-*

*ioni v. United States,* 10 Cl.Ct. 17, 26 (1986) (Although it may be true that "a proposal which ultimately fails to conform to material terms of the solicitation should be considered unacceptable," "[w]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand").

Bliss has failed to carry its heavy burden of proof even with regard to the preliminary question whether Pressmasters' proposal was conforming. Pressmasters did not itemize the parts it would supply, including a new crankshaft, with the particularity that Bliss did in its proposal; the only specific reference to a crankshaft in Pressmasters' proposal was with regard to an optional item. Pressmasters, however, plausibly has explained that it intended to supply new crankshafts, and that the optional item was a more technologically advanced crankshaft than the solicitation required. Furthermore, Bliss does not dispute evidence the Court of Federal Claims cited indicating that "Pressmasters already ha[s] provided new crankshaft parts at no extra cost to the agency." *E.W. Bliss Co.,* 33 Fed.Cl. at 132.

 Moreover, Bliss has failed to prove that the Mint acted arbitrarily and capriciously in awarding the contract on the basis of its belief that Pressmasters' proposal included a new crankshaft. With regard to the *Keco* factors, Bliss has not even alleged, much less shown, bad faith by the government. Furthermore, Bliss has not shown that the provision of new crankshafts was so significant that their absence tainted the entire procurement, so that the Mint had "no reasonable basis" for making the award to Pressmasters. Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason. . . . even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

## IV.

Bliss' twelve other substantive challenges to the procurement primarily are either repetitive of the arguments with regard to the crankshaft, or deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); *cf. Widnall,* 75 F.3d at 1582. The Court of Federal Claims fully considered and properly rejected each of these claims, and we rely on its analysis in rejecting them.

## V.

 Finally, Bliss contends that the Court of Federal Claims improperly refused to allow it to amend its complaint. The facts relating to this issue are as follows:

More than eight months after filing its suit, and nearly seven months after moving for summary judgment, Bliss moved to amend its complaint to add five more issues to the thirteen already asserted. Its reason for this belated request was that it had only recently received a copy of Pressmasters' technical proposal, which contained information allegedly relevant to the new issues. In

opposing the motion, the government pointed out that "[h]ad plaintiff's counsel considered that his knowledge of plaintiff's causes of action was incomplete in August 1994 [the date of Bliss' summary judgment motion], plaintiff should have requested documentation prior to filing a dispositive motion." The Court of Federal Claims denied Bliss' motion because

> [t]he interest of justice would not be served by allowing the amendment. During argument on January 30, 1995, the court explained to counsel for plaintiff why amendment at this late date would not be permitted. In denying plaintiff's motion for failure to show any good cause why it should be granted, the court relies on and incorporates the discussion during argument and the reasons set forth in defendant's opposition....

■ "This Court reviews such actions [refusing to allowing an amendment of the complaint] only for abuses of discretion." *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1038 (Fed.Cir.1992). The Court of Federal Claims did not abuse its discretion in denying amendment almost seven months after Bliss had moved for summary judgment and at a time when decision on that motion was imminent. (The motion to amend was dated February 10, 1995, and the court filed its 35 page opinion on March 31, 1995.)

Bliss' only explanation for its belated request is that "[t]he Mint released awardee's technical proposal just seven and one-half months after litigation was instituted." Bliss, however, does not dispute the government's point that it could have requested a copy of that proposal at any time during the discovery period, but failed to do so. The Court of Federal Claims properly concluded that "[t]he interest of justice would not be served by allowing the amendment."

## CONCLUSION

The judgment of the Court of Federal Claims is

*AFFIRMED.*