T & S PRODUCTS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

The Ensemble Co., Intervenor.

No. 00–432C.

United States Court of Federal Claims.

Oct. 23, 2000.[1]

---

1. This opinion was issued under seal on October 4, 2000. Pursuant to ¶ 4 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. Brackets denote the deletions.

Claude P. Goddard, Jr., Vienna, VA, for plaintiff. David P. Hendel, Wickwire Gavin, P.C., of counsel.

Allison A. Page, with whom was Assistant Attorney General David W. Ogden, for defendant. Zoe C. Strickland, Alexa Zevitas, United States Postal Service, of counsel.

Robert P. Reznick, Washington, DC, for intervenor. John M. Townsend, Robert B. Funkhouser, and Mira V. Edelman, Hughes Hubbard & Reed LLP, of counsel.

## OPINION

MILLER, Judge.

This case comes before the court after argument on a bid protest action alleging that the United States Postal Service (the "USPS") improperly awarded a mail packaging supplies contract. Specifically, the protestor argues that (1) the USPS did not inform offerors that the USPS sought non-Postal Service experience and looked unfavorably on Postal Service experience; (2) the USPS improperly downgraded the protestor's proposal because it lacked a discussion of product branding; (3) after amending the solicitation and receiving revised proposals, the USPS did not rescore the protestor's proposal; (4) the USPS had discussions with the awardee about weaknesses in its propos-

al, but did not have discussions on point with the protestor (5) the USPS impermissibly relied on commitments by the awardee about its parent company's financial and other resources absent any formal undertaking or other commitment by the parent. After a stereoscopic reexamination of the evaluation process, including the scoring of all the proposals, the court rules that the protestor has not met its burden to disturb the award.

## FACTS

Solicitation No. 412735–00–A–0061 (the "Solicitation") sought outside assistance in providing and marketing packaging and mailing supplies to be sold at United States Post Offices. The Solicitation explains at Section 1.2 that the USPS has sold packaging and mailing supplies for the past 20 years, but the USPS assessed that these supplies have been sold in an inconsistent and sporadic manner. Section 1.2 states that the USPS sought to eliminate these problems and to increase its revenue by offering a core product line of supplies, including boxes, tubes, envelopes, address labels and packing materials. Under the Solicitation, § 1.1, the USPS sought a partner "to introduce a standardized range of USPS branded retail packaging and mailing supplies within postal retail sites."

In its proposal submitted to the USPS, T & S Products, Inc. ("plaintiff"), described itself as a large supplier of mailing supplies. The proposal further stated that during the past ten years, plaintiff has supplied packaging products to the USPS through various contracts. According to the Executive Summary of the proposal, plaintiff provides "packaging and mailing supplies and distribution services in 43 Postal Districts" to "over 20,000 USPS retail units nationwide, with annual sales of over $8 million."

Before accepting proposals for the contract, the USPS undertook a pre-qualification process. The USPS sent out a June 4, 1999 Memorandum for Potential Packaging Products Vendors. The USPS listed several "key points to keep in mind," one of which stated that the "USPS encourages the use of partnering or subcontracting arrangements as long as there is assurance of performance accountability, quality, and specific value-added contributions."

After pre-qualifying a number of vendors, the USPS issued the Solicitation, which included nine evaluation factors weighted to make up a 100–point score. The factors were weighted, as follows:

| | | |
|---|---|---|
| 1. | Level of Service Response | 25 points |
| 2. | General Management | 20 points |
| 3. | Technical Approach | 20 points |
| 4. | Management Plan | 10 points |
| 5. | Personnel | 5 points |
| 6. | Warehousing and Distribution | 5 points |
| 7. | Products Production & Development | 5 points |
| 8. | References | 5 points |
| 9. | Capability | 5 points |

The first seven factors related to the specific proposal submitted by the vendor, and the last two were related to the vendor itself.

The USPS received proposals from three vendors: plaintiff, the Ensemble Company ("intervenor"), a subsidiary of Hallmark Cards, Inc. ("Hallmark"), and Rand–Whitney Container, LLP. The USPS Headquarters and field unit members comprised an evaluation team of six members who independently reviewed and reported on each proposal.[2] Daniel J. Barrett was the liaison between the evaluation team and the Contracting Officer, Kathleen Burt.

Each of the USPS evaluation team members completed an individual evaluation of each proposal. The team then met and drafted a consensus report for each proposal. The draft report totaled the five individual scores, resulting in the following totals (with a maximum of 500 points):

Ensemble—[ ] points

Rand Whitney—[ ] points

T & S—[ ] points

After the draft report was completed, however, the team realized that plaintiff had proposed a level of service and price that was different than the levels proposed by intervenor and Rand–Whitney. These differing levels made comparison of the proposals difficult. In an e-mail transmission dated February 24, 2000, Mr. Barrett asked Contracting Officer Burt to address this issue.

---

**2.** The record shows, however, that only five of the team members assigned numerical ratings to their comments.

In the meantime the evaluation team performed site visits. In letters to all three vendors dated March 6, 2000, the contracting officer stated that the purpose of the site visit was "to confirm and validate the respondent's capabilities through a process of inspection, observation, and information gathering." The team performed site visits for each vendor during the week of March 13, 2000. When performing Ensemble's site visit, the team visited Hallmark's Retail Support Center and visited two Hallmark distribution centers.

The USPS then issued two amendments to the solicitation on April 11, 2000, and April 13, 2000, respectively. These amendments sought to standardize the requirements for service under factor one, "Level of Service Response," so that the vendors' proposals could be compared. The proposal submission instructions stated that "[a]ll other Tabs [3] and associated scorings within the original solicitation package will remain as originally proposed."

After the site visits and amendments, the three vendors submitted revised proposals directed to the amendments. The proposals were rescored by the evaluation team. After this rescoring, during the week of May 15, 2000, via e-mail, the team made final adjustments to Packaging Products Final Proposal Evaluation Summary. On May 26, 2000, the contracting officer sent intervenor a list of weaknesses that the evaluation team had identified in its proposal. On June 1, 2000, intervenor's representatives met with Contracting Officer Burt to discuss the list of weaknesses. On June 2, 2000, the evaluation team issued the Packaging Products Final Proposal Evaluation Summary, which was the team's final report on the solicitation results. Intervenor responded to the list of weakness formally with a letter dated June 7, 2000. On June 16, 2000, the contracting officer issued a determination that intervenor provided the best value to the USPS. On June 26, 2000, the USPS awarded the contract to intervenor.

On July 24, 2000, plaintiff filed the instant action seeking injunctive and declaratory relief. The complaint alleges that the selection of intervenor was arbitrary, capricious, and contrary to regulations and that the USPS "violat[ed] the law." Compl. filed July 24, 2000, ¶¶ 6, 7. On July 24, 2000, plaintiff also requested a temporary restraining order enjoining the USPS from proceeding with performance of the contract. At a hearing held on July 26, 2000, plaintiff withdrew this request. *See* Transcript of Proceedings, *T & S Products v. United States*, No. 00–432C, at 68–69 (Fed.Cl. July 26, 2000). On August 25, 2000, defendant and plaintiff filed simultaneous motions for judgment on the administrative record, and intervenor filed a memorandum in support of defendant's motion. Both parties' replies were filed on September 11, 2000, with intervenor filing a separate brief in support of defendant's motion for judgment on the administrative record. On September 12, 2000, the court granted plaintiff's motion to supplement the administrative record with documents relating to the pre-solicitation process. After argument the court ordered supplemental briefs to address Hallmark's role in Ensemble's proposal. Plaintiff, defendant, and intervenor filed supplemental briefs on September 29, 2000.[4]

## DISCUSSION

### I. *Standard of review*

The Court of Federal Claims maintains jurisdiction, pursuant to the Tucker Act, "to

---

**3.** The USPS denoted each of the nine evaluation factors as a "Tab." Thus, the amendments were only directed to "Tab 1—Level of Service Response."

**4.** On September 29, 2000, intervenor filed a Motion To Supplement the Administrative Record. The motion sought to introduce two "supplemental" declarations made on September 27 and 29, 2000, respectively. These declarations addressed arguments raised at the September 22, 2000 oral argument and obviously were made well after the administrative record was formed. Because "the focal point for judicial review should be the administrative record already existence, not some new record made initially in the reviewing court[,]" *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the court denies intervenor's motion because intervenor's self-serving *post facto* declarations do not explain actions that are inadequately explained in the record, nor do they constitute evidence arising after the agency action that shows whether the decision was correct or not. *See GraphicData v. United States*, 37 Fed.Cl. 771, 779 (1997) (citing cases).

render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (Supp. IV 1998).

▄ The court evaluates the procuring agency's conduct to determine whether the Government's conduct was arbitrary and capricious. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). To prevail under the arbitrary and capricious standard, a frustrated offeror is required to establish that (1) the Government officials involved in the procurement process were without a rational and reasonable basis for their decision, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal docketed,* No. 00–5028 (Fed.Cir. Dec. 10, 1999). Because this case involves a USPS purchasing contract, the "applicable statutes and regulations" are contained in Issue 1 of the 1997 United States Postal Service Purchasing Manual (the "Purchasing Manual"). The USPS is authorized to issue these contracting regulations under 39 U.S.C. § 401 and 39 C.F.R. Part 601 and § 226.2(c)(1) (1995). *See Modern Systems Technology Corp. v. United States,* 979 F.2d 200, 202–03 (Fed.Cir.1992).

▄ A protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence. *See CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988); *Ellsworth,* 45 Fed.Cl. at 392; *R.R. Donnelley & Sons, Co. v. United States,* 38 Fed.Cl. 518, 521–22 (1997); *PCI/RCI v. United States,* 36 Fed.Cl. 761, 767 (1996). The injunctive relief sought by a frustrated offeror is appropriate "only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.

Cir.1983). In the context of a bid protest, an agency is entitled to wide discretion in its evaluation of bids. *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988); *Ellsworth,* 45 Fed.Cl. at 392. The reviewing court cannot substitute its own judgment for that of the agency. *Ellsworth* at 392–93. Furthermore, technical rating decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996).

▄ The aggrieved party faces a higher burden when the negotiated procurement grants government officials a great deal of discretion. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980); *Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131, 137 (1999). It is well established that the scoring of proposals within the competitive range falls within the discretion of the procurement officials. *See Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229, 241 (1983). Thus, " '[i]n reviewing [plaintiff's] protest of the agency's technical evaluation and decision to eliminate an offeror from the competitive range, we will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation.' " *Beta Analytics,* 44 Fed.Cl. at 137 (*quoting Beneco Enterprises, Inc.,* 70 Comp. Gen. 574, 576 (1991)).

## II. *Award to intervenor*

### 1. *Non-postal experience*

Plaintiff argues that the USPS "committed prejudicial error when it downgraded [plaintiff] on the basis of its lack of outside retail experience, because such experience was not identified as an evaluation criterion in the Solicitation." Plf's Br. filed Aug. 25, 2000, at 21. In its complaint plaintiff alleges the USPS's use of unstated evaluation criteria violated Purchase Manual section 4.3.4.b,

which states, in pertinent part, that "[o]ffers will be evaluated in accordance with the performance evaluation factors contained in the solicitation." Plaintiff notes that under Purchasing Manual section 4.2.5.a.1, an evaluation consists of "evaluation of individual proposals in relation to the solicitation's stated performance evaluation factors."

Under the "References" evaluation factor, the solicitation stated:

Provide 3 references for past performance, to include quality, timeliness, business relations, cost controls and supply chain management. These should be for a project of a similar nature to USPS requirements and should include a brief description.

Plaintiff seizes on the phrase "of a similar nature to USPS requirements" as the linchpin of its claim that the USPS used "unstated" criteria in evaluating plaintiff's offer. Plaintiff posits that the only "stated" evaluation factor was an evaluation of "similar" experience. According to plaintiff, "similar experience" can only mean "USPS experience." Therefore, any evaluation based on non-USPS experience was based on an unstated evaluation criteria. Plaintiff complains that it was unfairly evaluated for failing to list its non-USPS experience. Plaintiff also asserts that the USPS gave too much credit to intervenor for non-USPS experience. The gist of plaintiff's argument is that the use of the phrase "of a similar nature to USPS requirements," coupled with the Purchasing Manual's admonition against evaluating a proposal on other than stated factors, somehow forbade the evaluators from considering non-USPS experience in the manner that the USPS did.

The individual evaluations demonstrate that the evaluation team did consider both the USPS and non-USPS experience of all three offerors when evaluating each proposal. For example, one individual reviewer of intervenor's proposal noted: [ ] In the Packaging Product Final Proposal Evaluation Summary, the team concluded that the personnel intervenor proposed to administer the contract [ ] These comments about intervenor and plaintiff are typical of the evaluators' response to each vendor's proposal.

■ Given the limited nature of the permissible judicial inquiry, this court addresses whether the USPS acted irrationally or erred in applying an applicable procurement regulation by evaluating the offerors based on non-USPS experience. Experience "of a similar nature to USPS requirements" rationally could signify any experience that dealt with providing mail or packaging supplies on the scale contemplated by the proposal. Nothing is so unique about USPS projects that the evaluators could not consider a vendor's non-USPS experience. Even the case on which plaintiff bases its unstated evaluation argument recognizes that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors[.]" *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 45 (1997) (*quoting Amtec Corp.*, 95–2 CPD ¶ 164, at 4 (Comp.Gen.)).[5]

■ That non-USPS experience was intrinsic to the evaluation is borne out by the proposals of intervenor and the other offeror, Rand–Whitney. Both offerors recognized that "similar" experience meant any experience that would demonstrate to the evaluators that they were capable of servicing and expanding the USPS's mailing and packaging needs. In demonstrating this capability, their proposals contain references to non-USPS experience.[6]

The court rejects plaintiff's argument that "similar" experience signified that the USPS could not have interpreted the evaluation to

---

5. Similarly, plaintiff's reliance on *Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 1992 WL 19716 (1992), does not support the proposition that injunctive relief is appropriate when the solicitation did not put offerors on notice of the predominant factor in the evaluation. The offerors in *Isratex* were not informed that their entire proposal would be disqualified automatically after failing a technical test under one factor. In the case at bar, no technical evaluations or tests were conducted, and plaintiff's proposal was not disqualified automatically.

6. The court notes that if the USPS had included "non-USPS experience" as an explicit factor, plaintiff, [ ].

include non-postal experience. In point of fact, almost the only irrational interpretation of the phrase "of a similar nature to USPS requirements" would be the interpretation that plaintiff now advances—that "similar" means "USPS only." For the court to accept such an interpretation would be judicial second-guessing of the agency's own interpretation, which is itself palpably reasonable. The court cannot and will not do so. *See Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 579, 492 F.2d 1200, 1206–07 (1974) (stating that "litigation which second-guesses bid determinations, through efforts to show ordinary lack of due care in appraising competing proposals, should not be encouraged where the award was rational and made in good faith").

The USPS also reasonably could inquire into a vendor's experience (with the USPS or otherwise) in areas such as customer service, shipping, warehousing, management or technical capabilities, as these items are all listed as evaluation factors in the solicitation. While the evaluation factors under these items do not make explicit mention of experience as a rating factor, it is axiomatic that an evaluator would look to an offeror's past performance, if proffered, as evidence of the offeror's capability. The record supports a finding and conclusion that the USPS did not act in an arbitrary or capricious manner or violate any provision of the Purchasing Manual when evaluating the offerors' past experience.

### 2. *Branding*

 Plaintiff argues that the USPS improperly downgraded plaintiff for failing to propose a strategy to establish the "branding" of the packaging and mailing supplies. Plaintiff charges that consideration of branding was improper because "the Solicitation did not call for or contemplate evaluation of such branding services." Thus, according to plaintiff, the USPS utilized criteria that were not stated in the Solicitation and violated Purchasing Manual section 4.3.4.b.

Numerous provisions throughout the solicitation show that the USPS viewed branding as pivotal to evaluating potential vendors. The Solicitation's Statement of Purpose, ¶ 1.1, provided ample notice that branding would be a central component of the contract:

The United States Postal Service (USPS) will partner with a vendor to introduce a standardized range of USPS branded retail packaging and mailing supplies within postal retail sites. The purpose of this plan is to:

♦ Increase revenue contribution of packaging and mailing supplies

♦ Provide added convenience to USPS customers

♦ Decrease overall costs of program administration

♦ Contribute to a stronger, more consistent and positive USPS retail image

Under "Private Label Products," ¶ 2.2.2, the Solicitation stated:

All products provided by the partner firm must carry the USPS brand logo. . . . The USPS enjoys a widely recognized brand name, and will capitalize upon this recognition to strengthen the new product line and create a brand image that is unique.

In "Discretionary Products," ¶ 2.2.5, the Solicitation instructed:

The partner firm must recommend additional products ... based on the partner firm's experience in comparable retail channels. All recommendations must conform to USPS packaging and brand image standards . . . .

These references were sufficient to put any vendor on notice that the USPS would be looking at its ability to develop branding as part of contract performance. Under the "General Management" evaluation factor, the Solicitation further informed offerors that they would be evaluated on their "[u]nderstanding of the mission and objectives of the packaging program." Solicitation, Attachment 3 at 3. As the Solicitation excerpts reveal, one objective of the program was to develop the brand image of the USPS. The decision to evaluate vendors on their discussion of branding was thus rational and reasonable and otherwise did not run afoul of section 4.3.4.b of the Purchasing Manual. Plaintiff's claim to the contrary is not only unconvincing, it is undercut by plaintiff's own proposal.

Plaintiff itself provided a discussion of branding in its proposal. [ ]

That the USPS was not convinced that plaintiff either understood this part of the contract or could fulfill its requirements [7] does not warrant disturbing the agency's award. Plaintiff, intervenor, and Rand–Whitney each devoted some part of their proposals to a discussion of branding. The evaluators acted well within their discretion in evaluating each offeror's discussion of branding.

The court reiterates the Federal Circuit's admonition that technical rating decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.* 77 F.3d at 449 (Fed.Cir.1996).

### 3. *Rescoring of proposals*

■ The USPS issued two amendments to the Solicitation. The amendments specified the exact requirements of the "Level of Service" factor in order to allow the evaluation team to compare and rescore the vendors' proposals.[8] Plaintiff argues that after amending the solicitation and receiving revised proposals, the USPS failed to rescore plaintiff's proposal, but did rescore Intervenor's offer to the prejudice of plaintiff. Plaintiff claims the USPS committed prejudicial error when the evaluation team disregarded language in the amendments stating that "[a]ll other Tabs and associated scorings within the original solicitation package will remain as originally proposed." *See Proposal Submission Instructions and Evaluation*

*Criteria for Response to Amendment,* Admin. Rec. at 00020.

On April 11 and April 13, 2000, the USPS issued the two amendments to the Solicitation, which standardized the service requirements under the contract. Under "Proposal Submission Instructions and Evaluation Criteria for Response to Amendment," the vendors were advised that the scoring of Tab 1—"Level of Service Response" would be changed pursuant to the amendments. The vendors also were advised that "[a]ll other Tabs and associated scorings within the original solicitation package will remain as originally proposed." The vendors then resubmitted proposals addressing the amendments.

Plaintiff is correct that the amendment instructions did not permit a rescoring based on the amended proposals. If, upon receipt of the amended proposals, the evaluation team rescored the entirety of intervenor's proposal, or rescored only intervenor's proposal, such actions would be a clear violation of the USPS's own instructions issued pursuant to the amendment. However, the Administrative Record demonstrates that each individual evaluator completed an evaluation form only for the "Level of Service Response" factor affected by the amendment. The evaluators' comments did not carry over to any other areas of the proposals. The evaluation team downgraded intervenor's proposal [ ] points based on intervenor's amended proposal.[9] Plaintiff's proposal also was downgraded [ ] points.[10] Thus, both intervenor's and plaintiff's proposals were rescored. Plaintiff's complaints that its proposal was not rescored are not supported by the record.[11]

---

7. In the Packaging Products Final Proposal Evaluation Summary, the evaluation team decided that plaintiff's [ ].

8. The proposals submitted pursuant to the original Solicitation proposed widely differing "Levels of Service" and the evaluation team had difficulty making comparisons.

9. The original draft Packaging Products Proposal Evaluation Summary scored intervenor's proposal at [ ] under "Level of Service Response." After the amendment the "Level of Service Response" evaluation score was broken into two categories, the total of which for intervenor was [ ], resulting in a difference of [ ] points.

10. The original draft Packaging Products Proposal Evaluation Summary scored plaintiff's proposal at [ ] under "Level of Service Response." After the amendment the "Level of Service Response" evaluation score was broken into two categories, the total of which for plaintiff was [ ], resulting in a difference of [ ] points.

11. Plaintiff's motion asserts that "T & S's score in level of service inexplicably decreased from a total of [ ] points between the preparation of the Proposal Evaluation Summary and the Final Evaluation Summary." Plf's Br. filed Aug. 25, 2000, at 33, n.8. Plaintiff's bewilderment may stem from a failure to note pages 1401–07 of the Administrative Record, which contain the evalu-

After the evaluations were submitted and site visits were completed, Mr. Barrett, the evaluation team's liaison to the contracting officer, began to draft a final summary for submission to Contracting Officer Burt. Mr. Barrett undertook to consolidate the amendment scores and prepare a final summary. In doing so, on May 15, 2000, he e-mailed the evaluation team stating he "noticed there were some strengths and weaknesses in some areas that were originally noted by the team, which now do not apply." Mr. Barrett concluded that "[w]e need to take another look at our final scoring in some areas." To this e-mail he attached a document which summarized the proposal areas requiring revision because the original weaknesses noted by the team had been addressed by a change in the contract requirements or by the site visits.

Prompted by this e-mail, the individual evaluation team members submitted revisions to their original analyses of the proposals. As the record demonstrates at pages 01418 through 01429, intervenor's overall score was raised [ ] points, which, combined with its previous downgrade of [ ] points, yielded a net increase of [ ] points. The team then concluded that, with regard to plaintiff's proposal, "[t]he strengths and weaknesses indicated are consistent with all information received from T & S," and plaintiff's score was not changed. Finally, Rand–Whitney's score was increased [ ] points in one area after the team realized that some of the weakness associated with the original proposal were no longer valid.

The chronology of the events after the amendment shows that, after the "Level of Service" amendments were issued and the proposals were resubmitted, the evaluators did not rescore the entirety of the proposals, only the "Level of Service" portion. It was later that the team, using insights gained from the site visits and from close attention to the requirements of the contract, undertook to rescore the proposals in their entirety. The team did so in order to prepare a specific and carefully considered final sum-

mary of the vendors' proposals. Plaintiff attempts to bend the Administrative Record around a theory that the evaluation team deliberately sought to undermine plaintiff's proposal by not rescoring it. In actuality, after rescoring the portions of the proposals affected by the amendments was completed, the evaluation team reasonably and rationally decided to fine tune the Packaging Products Final Proposal Evaluation Summary.

Plaintiff has not offered sufficient evidence that USPS's evaluation was arbitrary or capricious or that the USPS disregarded the amendment's instructions. The USPS evaluated the proposals according to the amendment's instructions. If anything, the evaluation team exhibited close attention to detail and efforts to assure that the final draft of the Packaging Products Final Proposal Evaluation Summary fairly and accurately represented the strengths and weaknesses of each proposal.

### 4. Discussions with intervenor

█ Plaintiff charges that the USPS's discussions with intervenor about weaknesses in intervenor's proposal violated the Purchasing Manual. The events plaintiff complains of unfolded, as follows.

On May 25, 2000, Contracting Officer Burt sent intervenor a letter that contained (1) a list of weaknesses culled from a draft Packaging Products Final Evaluation Summary sent by Mr. Barrett and (2) a sentence confirming that there would be a meeting on June 1, 2000, "to discuss some remaining issues and price reasonableness uncertainties." On June 1, 2000, intervenor met with the contracting officer to discuss the list of weaknesses. However, it was not until June 2, 2000, that the evaluation team issued the final draft of the Packaging Products Proposal Final Evaluation Summary to the contracting officer. Intervenor responded to the list of weakness formally with a letter dated June 7, 2000. On June 16, 2000, the contracting officer issued a determination that intervenor provided the best value to the

---

ators' comments and scores on the amended proposals. In any event, the record fully explicates the decrease in plaintiff's score—it occurred immediately after the USPS evaluated the amended proposal submitted by plaintiff.

USPS. On June 26, 2000, the USPS awarded the contract to intervenor.

Plaintiff argues that conducting these discussions with intervenor before a best value determination had been made violated the Purchasing Manual. Plaintiff points to the Purchasing Manual, ¶ 4.2.5.c(3), which provides:

(d) The final stage of discussions is reaching agreement on the contract's terms and conditions with the apparently successful supplier. The goal of this stage is to reach the best business arrangement for the Postal Service, and during this stage any remaining issues should be addressed and revised. However, if the extent of these issues may reasonably be viewed as changing the rationale for determining the best value to the Postal Service, the contracting officer must consider reopening discussions with other suppliers. In no event may changes be made to the Postal Service's requirements or the supplier's proposal which, if made before supplier selection, would have affected the basis for that selection.

Plaintiff argues that this provision of the Purchasing Manual requires that "final discussions" be held only after a best value determination and then only to address contract "terms and conditions." Because the discussions were held before the June 16, 2000, best value determination and concerned weaknesses in the proposal, as opposed to "terms and conditions" of the contract, plaintiff argues that ¶ 4.2.5.c(3)(d) was violated.

Yet, ¶ 4.2.5.c(3) also provides:

(a) During the evaluation process . . . discussions may be held with any supplier in order to clear up misunderstandings or uncertainties or to gain a better understanding of the supplier's responses and intent regarding the solicitation's provisions including its performance factors, and any aspect of a supplier's proposal including price, in order to obtain a more

informed comparison of the relative value of individual proposals.

The USPS was free to discuss "any aspect of a supplier's proposal" with any supplier at any time during the evaluation process. The record shows that the USPS had discussions with intervenor on June 1, 2000, "to gain a better understanding of the supplier's responses . . . in order to obtain a more informed comparison of the relative value of individual proposals." Purchasing Manual, ¶ 4.2.5.d(3)(a). Whether or not the best value determination had been made has no bearing on these discussions and ¶ 4.2.5.d(3)(d) is inapplicable.[12] The court finds that all applicable provisions of ¶ 4.2.5.d(3) of the Purchasing Manual were followed, and the actions of the USPS were neither arbitrary nor capricious in doing so.

### 5. *Hallmark/Ensemble*

The court is chary of suggesting issues to the parties. Litigation strategy is the purview of advocates, not the court. During oral argument the court prodded plaintiff into developing an issue that was noted in its brief. *See* Plf's Br. filed Aug. 25, 2000, at 29. After plaintiff expressed willingness to explore the issue further, the court ordered supplemental briefing and supplementing of the record with documents relating to the pre-qualification process. Plaintiff's final argument thus relates to the evaluation of intervenor and its relationship to its parent company, Hallmark.

Plaintiff maintains that the award to intervenor was arbitrary and capricious because the evaluators assessed intervenor's proposal based on the capabilities of intervenor's parent company, although intervenor's proposal never committed to providing its parent's resources and Hallmark did not manifest its agreement to support intervenor. Defendant argues reliance upon a subsidiary's representations that its parent is committed is per-

---

12. Similarly, the broad language of ¶ 4.2.5.d(3)(a) forecloses plaintiff's argument that, under ¶ 4.2.5.d(3)(b), discussions with all offerors were required unless the evaluation team made a specific finding of "no business necessity" for such discussions. Not only is such a finding not required by the Purchasing Manual, but ¶ 4.2.4.d(3)(a) expressly allowed the discussions that occurred on June 1, 2000.

missible, even without a direct commitment from the parent.[13]

The Administrative record is replete with Ensemble's [14] assertions, both explicit and implicit, that, if awarded the contract, Ensemble's parent company ("Hallmark") would stand behind Ensemble to the benefit of the USPS. One example of this commitment is the "Retail Support Center." This Support Center is touted heavily in Ensemble's proposal, yet it is apparent that the Support Center is controlled by and belongs to Hallmark. Under the "Level of Service Response" factor, Ensemble's proposal discusses the "Hallmark Retail Support Center" and purports to offer the USPS a "dedicated sales force." The proposal notes that the Retail Support Center Sales Representative (who apparently would work with the USPS as part of the Retail Support Center Sales Organization) "is responsible for representing Hallmark Cards, strengthening the relationship between the retailer and Hallmark Cards." Further, "[t]he USPS database containing all ordering and shipping data, by location, will be maintained in Hallmark's order processing system, as with all Hallmark accounts." The proposal goes on to mention the Hallmark Support Center's bilingual capabilities, Quality Assurance program, and auditing procedures. Yet, this discussion does not include any reference to what recourse the USPS would have if it did not receive the services promised by the proposal. The Retail Support Center is only the tip of the proverbial iceberg: Ensemble's proposal promises use of Hallmark's Warehouse Management System, Hallmark's Information Technology Systems, Hallmark's Accounting Systems and other Hallmark resources. Nonetheless, Hallmark itself did not sign the proposal. While Ensemble bolstered its proposal with Hallmark's capabilities, Hallmark made no concomitant promise to provide those capabilities.

The proposal itself shifts in an almost schizophrenic manner between Ensemble and Hallmark. The first page of intervenor's proposal lists "Ensemble, a Hallmark Company," yet the proposal document itself refers to the offeror as "Ensemble/Hallmark." Later, the proposal metamorphoses into "Hallmark" with a discussion of the "Level of Service" factors, then changes to "Ensemble" when listing the first eleven Position Descriptions, but returns to "Hallmark" for the remaining Position Descriptions.

Equally confusing is the section of the proposal entitled "Respondent's Capability." Only details relating to Hallmark are listed: Hallmark's "[c]onsolidated net sales of $4.0+ billion," Hallmark's "45%+ market share," Hallmark's "20,100 full-time employees," Hallmark's "40,000 stock numbers," and so forth. Moreover, the entire history of the Hallmark company, beginning with its founder, Joyce C. Hall in 1910, is set forth. The history of Ensemble is notably absent. In fact, the entire category of "Respondent's Capability" contains no references to Ensemble save one: Under "Hallmark Subsidiaries," "The Ensemble Company, Lenexa, KS" is listed.

While the proposal itself may be unclear, the evaluations themselves are not. It is obvious that the evaluators [ ]. Both of these capabilities, however, taken from page 154 of Ensemble's proposal, are Hallmark's, not Ensemble's. [ ].

Arguing that it was arbitrary and capricious to accept Ensemble's proposal, plaintiff relies on these facts and a document sent by the USPS during the pre-qualification process. The June 4, 1999 pre-qualification letter sent to potential offerors stated that "USPS encourages the use of partnering or subcontracting arrangements as long as there is assurance of performance accountability, quality, and specific value-added contributions." According to plaintiff, because

---

**13.** Intervenor also makes an argument in favor of upholding the award. Intervenor embraces a theory of apparent authority, *viz*, that it possesses apparent authority to bind its parent to the contract. However, the issue can be resolved on the basis of more specific law. Allowing a contracting officer's award to stand based on his imputed knowledge of how common law principles operate would establish an unsettling precedent.

**14.** To facilitate understanding of the administrative record and plaintiff's argument, the court refers in this discussion to intervenor by its party name, "Ensemble."

the USPS did not obtain a formal written guarantee from Hallmark that it would back Ensemble's commitments, the USPS, rationally could not accept Ensemble's proposal. The USPS rejoins that Ensemble could rely on Hallmark's resources, so long as there were clear representations by Ensemble that Hallmark's resources would be available.

Both plaintiff and defendant cite to the Administrative Record demonstrating the persuasive presence of Hallmark in Ensemble's proposal to argue that Ensemble represented that Hallmark resources would be committed to the contract. The record dispels any doubt that the evaluators took these resources into account when awarding the contract to Ensemble. As plaintiff correctly notes in its supplemental brief, the only issue before this court then, is "whether the agency rationally concluded that the parent corporation was bound by the promises of its subsidiary." *See* Plf's Br. filed Sept. 29, 2000, at 4.

█ It is a "well established principle that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent will not be liable for the obligations of its subsidiaries." *BLH, Inc. v. United States*, 13 Cl.Ct. 265, 272 (1987) (citations omitted); *see also Johnson Controls World Services, Inc. v. United States*, 44 Fed.Cl. 334, 342 (1999). Plaintiff is absolutely correct to make this point. Hallmark is not bound by Ensemble's guarantees of Hallmark's resources, however strenuously advanced by Ensemble. If the legal issue before this court were a later refusal by Hallmark to provide the resources promised by Ensemble, a court might well consider the decisional law cited by plaintiff. The issue in this case, however, is whether the USPS acted in an arbitrary or capricious manner when it considered Hallmark's promised resources in evaluating the proposals and awarding the contract to Ensemble.

█ The court notes first that the Solicitation contained no prohibition against subsidiaries relying on the resources of their corporate parents in performing the contract. A line of decisions by the Comptroller General establishes that "[i]n the absence of such a prohibition ... where an offeror represents in its proposal that resources of its parent company will be committed to the contract, the agency properly may consider such resources in evaluating its proposal." *Physician Corp. of America*, 1996 WL 191140, *10 (Comp.Gen.) (unpubl.) (*citing Unison Transformer Servs., Inc.*, 88–2 CPD ¶ 471 (Comp. Gen.)); *see also J.A. Jones Const. Co.*, 87–2 CPD ¶ 215 (Comp.Gen.) (unpubl.); *Vector Engineering*, 81–2 CPD ¶ 9 (Comp.Gen.) (unpubl.). This case represents exactly such a situation. The agency involved enjoys the freedom to take subsidiaries at their word that their parent corporations' resources will be available, and the court sees no basis for rejecting this view of the law.[15] Here, the USPS's pre-qualification letter asked only for "assurance of performance accountability" and the USPS evaluators apparently perceived Ensemble's proposal alone as providing this assurance. Plaintiff's protestations to the contrary, this court's role is not to decide whether the USPS's course not to require a firm commitment by Hallmark was well-advised, but whether it was arbitrary and capricious, given the whole-hearted commitment by Ensemble.

Under the heading "Corporate Commitment," Ensemble's proposal contains language indicating that "[a] team of people crossing both companies from appropriate departments and disciplines, has been assembled and has worked to develop this response and implementation strategy." After the evaluation team visited a Hallmark-owned Retail Support Center on the site visit, Julie Parks wrote evaluation team member Donna Ward stating: "I hope you were able to get an overview for [sic] the service we provide ... [i]f you have any further questions please do not hesitate to contact someone here at Hallmark." The visit to Hallmark facilities, the contact with Hallmark personnel, and the

15. While not bound by decisions of the GAO, the Court of Federal Claims historically has afforded them deference, *E.W. Bliss Co. v. United States*, 33 Fed.Cl. 123, 134–35 (1995), *aff'd*, 77 F.3d 445 (Fed.Cir.1996), especially when the courts have not issued decisions on point.

proposal language itself support a finding that the USPS did not act arbitrarily or capriciously in deciding that it had received "assurance of performance accountability" such that the resources of Hallmark should be taken into account when evaluating Ensemble's proposal.

Plaintiff cites a number of other Comptroller General decisions for the proposition that an agency may not properly take a parent's resources into account when evaluating a subsidiary's proposal, all of which are distinguishable from or inapposite to the instant case.

In *Cavalier Computing; System Planning Corp.*, 91–2 CPD ¶ 446 (Comp.Gen.), the GAO sustained a bid protest because the evaluating agency relied on the audited financial statement of the parent company of the offeror. The GAO also specifically noted that this reliance was improper only because "there is no indication that [the parent] accepted financial responsibility for [the offeror] or for this contract, and it is unclear on what basis the [agency] could rely on those statements to satisfy its concerns about [the offeror's] financial situation." *Id.* at 6. The court already has determined that there were indications that Hallmark accepted some responsibility under the contract and Ensemble's proposal provided the basis for such a conclusion by the USPS.

In *Universal Building Maintenance, Inc.*, 99–2 CPD ¶ 32 (Comp.Gen.) (unpubl.), the GAO held that the agency did not reasonably evaluate the offeror's proposal regarding the offeror's past performance, because the parent company was the entity with such past performance and there was "no indication from the awardee's proposal that the parent company intend[ed] to use its workforce, management, facilities, or other resources in performing this contract." *Id.* at 5. Such is not the case in Ensemble's proposal. In *Universal Building* the GAO recognized that it would be appropriate to consider a parent corporation's experience "where it will be

involved in the contract effort." *Id.* (*citing NAHB Research Ctr., Inc.*, 98–1 CPD ¶ 150 (Comp.Gen.)).

*Instruments & Controls Services Co.*, 86–2 CPD ¶ 581 (Comp.Gen.) (unpubl.), is similarly unavailing. In that case, the contracting officer required, as part of the solicitation process, a formal corporate guarantee before considering the parent's financial resources. When the guarantee was not provided as per the contracting officer's instructions, the contracting officer did not consider the resources of the parent company. Here, the USPS never asked for a formal corporate guarantee from any offeror, instead requiring only "assurance of performance accountability."

Finally, plaintiff cites to *Barnes & Reinecke, Inc., and FMC Corp.*, 89–2 CPD ¶ 572 (Comp.Gen.) (unpubl.). The GAO determined that the evaluators properly had refused to consider the parent corporation's resources where the offeror identified itself as an independent cost center within a greater corporate structure and did not clearly commit the resources of its parent in its proposal. *Id.* at 4. The situation is reversed in this case. The proposal manifests a close alliance between Ensemble and Hallmark and Ensemble's proposal did commit the resources of Hallmark. Thus, *Barnes & Reinecke* is not applicable.[16]

### 6. *Other showings for injunctive relief*

#### 1) *Success on the merits*

In light of the foregoing discussion, plaintiff cannot succeed on the merits.

#### 2) *Irreparable harm*

Absent injunctive relief plaintiff would be irreparably damaged, and an action at law would be unavailing, because plaintiff could recoup only its proposal preparation costs in a suit for damages, but not loss of anticipated profits. *M. Steinthal & Co. v. Seamans*, 455

---

**16.** Plaintiff also cites *Hardie–Tynes Mfg. Co., aff'd on recon.*, 90–1 CPD ¶ 587 (Comp.Gen.), for the proposition that a subsidiary can rely on a parent only where the subsidiary seeks to satisfy a responsibility criterion through its parent's experience in the context of a sealed bid procurement.

In light of *Physician Corp. of America* and the line of decisions that precedes it, the court does not accept such a narrow reading of an agency's discretion in evaluating a subsidiary's commitment of its parent's resources.

F.2d 1289, 1302 (D.C.Cir.1971); *Essex Elec. Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983) (citing cases).

### 3) *Balance of hardships*

In considering whether to grant injunctive relief, the court next is required to balance the hardships imposed on the USPS and any third parties of ordering a recompetition against the harm to plaintiff from an unlawful award. Certainly the delay and inconvenience to be anticipated in the normal course of resoliciting the contract would impose significant burdens on USPS and intervenor, but this is the result to be expected when the interests of a protestor, awardee, and client agency are weighed. Because the court has not found the award to be irrational or contrary to the Purchasing Manual, the balance weighs in favor of the USPS.

### 4) *Public interest*

Lastly, the court considers the public interests at stake. Widespread support exists for the proposition that the public interest in protecting the integrity of the procurement system is well served by granting injunctive relief. *See Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859, 866–67 (D.C.Cir.1970); *PCI/RCI,* 36 Fed.Cl. at 776. Moreover, the public interest is served by ensuring that the Government closely adhere to the requirements of the procurement regulations. *See Scanwell Lab.,* 424 F.2d at 866–67. It is equally clear that assuring the timely completion of government contracts and protecting the public fisc are strong public interests. *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 795–96 (1991). In this case declining injunctive relief serves the public interest, given that plaintiff's challenges ultimately do not impugn the procurement process.

### CONCLUSION

Accordingly, based on the foregoing,

1. Intervenor's September 29, 2000 motion to supplement the administrative record is denied.

2. Defendant's and intervenor's motions for judgment on the administrative record are granted. Plaintiff's cross-motion for judgment on the administrative record is denied.

3. The Clerk of the Court shall enter judgment for defendant and intervenor.

4. By October 16, 2000, the parties shall file requests for deletion of protected/privileged material before the court issues its opinion for publication.

**IT IS SO ORDERED.**