# In the United States Court of Federal Claims

No. 13-256 C

(E-Filed Under Seal: July 23, 2013)[1]
(E-Filed: July 29, 2013)

|  |  |  |
|---|---|---|
| LAERDAL MEDICAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Bid Protest; Cross-Motions for |
| | ) | Judgment on the Administrative |
| v. | ) | Record; Dispute Regarding Technical |
| | ) | Evaluation of Mannequins to Be Used |
| THE UNITED STATES, | ) | to Train Army Combat Medics |
| | ) | |
| Defendant, | ) | |
| | ) | |
| & | ) | |
| | ) | |
| CAE HEALTHCARE, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

Cyrus E. Phillips, IV, Arlington, VA, for plaintiff.

Michael D. Snyder, Trial Attorney, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Martin F. Hockey, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United Stated Department of Justice, Washington, DC, for defendant. Debra J. Talley, Associate Command Counsel, Protest Division, Army Materiel Command, Redstone Arsenal, AL, of counsel.

Joseph P. Hornyak, McLean, VA, for defendant-intervenor.

## OPINION

HEWITT, Chief Judge

---

[1]This Opinion was filed under seal on July 23, 2013, and the parties were offered an opportunity to propose redactions. No party having proposed a redaction, see Pl.'s Mot. to Release Unredacted and Public Opinion, Docket Number (Dkt. No.) 47, at 2 (stating that "[t]he Parties have conferred and neither the Plaintiff, nor the Defendant, nor the Intervenor will request that designated material be redacted"), the Opinion filed on July 23, 2013 is now republished.

This is a post-award bid protest brought by Laerdal Medical Corporation (Laerdal or plaintiff), the awardee of Contract Number W900KK-12-D-0050 (the contract or Laerdal's contract) for the delivery of mannequins used to train combat medics. Post-Award Procurement Protest Compl. (Compl.), Docket Number (Dkt. No.) 1, ¶¶ 1-2. In this suit, Laerdal challenges a decision by the United States, acting through the United States Department of the Army's Program Executive Office, Simulation Training and Instrumentation Acquisition Center (PEO STRI, the Army, the government or defendant) to take corrective action in the form of terminating Laerdal's contract in response to a bid protest filed with the United States Government Accountability Office (GAO). Id.

Plaintiff and defendant have filed cross-motions for judgment on the administrative record. Before the court are plaintiff's and defendant's cross-motions for judgment on the administrative record and the associated briefing: Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Motion), Dkt. No. 31, filed May 7, 2013 with plaintiff's Statement of Facts, Dkt. No. 31-1, and Plaintiff's Brief in Support of Motion for Judgment on the Administrative Record (Pl.'s Mem.), Dkt. No. 31-2; Defendant's Opposition to Plaintiff's Motion for Judgment upon the Administrative Record and Cross-Motion for Judgment upon the Administrative Record (defendant's Motion or Def.'s Mot.), Dkt. No. 40, filed May 31, 2013; Plaintiff's Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record, Dkt. No. 42, filed June 12, 2013 with plaintiff's Counter-Statement of Facts, Dkt. No. 42-1, and Plaintiff's Brief in Support of Plaintiff's Opposition to Defendant['s] Cross-Motion for Judgment on the Administrative Record (Pl.'s Resp.), Dkt. No. 42-2; and Defendant's Reply in Support of Its Cross-Motion for Judgment upon the [Administrative] Record (Def.'s Reply), Dkt. No. 43, filed June 28, 2013. Defendant-intervenor CAE Healthcare, Inc. (CAE or defendant-intervenor) has not filed briefing.

I.     Background

       A.     The Solicitation

On April 23, 2012 the government issued Solicitation Number W900KK-12-R-0013 (the solicitation[2]), Admin. R. (AR) 918 (request for proposals (RFP)), for delivery of high-fidelity tetherless mannequins to be used to train soldiers "to treat wounds in the combat environment," AR 1025 (statement of work). The solicitation provided for the delivery of thirty-eight mannequins during the base year of contract performance and delivery of up to a total of 130 additional mannequins during four one-year option periods. AR 629 (Army GAO mem.) (providing contracting officer's statement of facts);

_____

[2]The solicitation consisted primarily of a request for proposals (RFP), see Admin. R. (AR) 918-1022 (RFP), a statement of work, see AR 1023-41 (statement of work), and a document providing submission instructions and describing the evaluation criteria to be applied, see AR 1042-57 (evaluation criteria).

AR 1981 (CAE 2d debriefing); see also AR 920-65 (RFP) (listing individually the items to be delivered).  The mannequins were to be purchased as commercial items pursuant to Federal Acquisition Regulation part 12.  See AR 918 (RFP) (titled, in part, "Order for Commercial Items"); cf. 48 C.F.R. (FAR) pt. 12 (2012) (governing acquisition of commercial items).  The solicitation also provided for the delivery of certain associated services and equipment.  See AR 1026-30 (statement of work) (stating that the awardee would be required to "provide all commercial products and services necessary to complete the tasks in this [statement of work]"); see, e.g., AR 920 (RFP) (requiring delivery of new equipment training).

The solicitation listed forty-nine numbered requirements, which it stated each mannequin "shall include."  AR 1037-40 (statement of work); see also id. at 1026 (stating that the awardee "shall deliver [mannequins] that meet the requirements as defined in this [statement of work]--including the [forty-nine numbered] Requirements").  Seven of these requirements were identified as "critical requirements."[3]  AR 1055-56 (evaluation criteria).  Of particular relevance to this case:  The mannequins were required to permit remote, tetherless operation and to "allow radio operation from a distance of 300 feet that is not [in the] direct line of sight."  AR 1037-38 (statement of work).  They were to include "anatomically correct pulse sites," id. at 1039, and "life-like ears with the capability to ooze simulated fluids appropriate to related injuries," id. at 1038.  Additionally, the mannequins were to be able to "simulate bi-lateral tension pneumothorax" and "human responses to both correctly and incorrectly performed needle decompression procedures."[4]  Id. at 1039.  The mannequins were required to be equipped

---

[3]The "critical requirements" were:  facial features, pulses, airway management, a trauma feature known as surgical cricothyroidotomy, needle capabilities, tourniquet procedures and antecubital IV placement.  AR 1055-56 (evaluation criteria).  The critical requirements were identified using the numbers provided in the list of forty-nine requirements contained in the statement of work and a short description.  See id. (identifying, for example, "A.1.27 Trauma Features:  Surgical Cricothyroidotomy" as a critical requirement).  However, the court notes that some of the numbers by which the critical requirements were identified appear to be off by one, based on the requirement descriptions.  Compare id. and AR 1061-62 (demonstration plan) (describing how the critical requirements were to be assessed, for example, stating that for A.1.27 "[e]valuators will perform a cricothyroidotomy") with AR 1037-40 (statement of work) (listing forty-nine requirements by number, for example, listing as A.1.27 that the mannequins "[s]hall provide the capability to perform bilateral chest tube training" but listing as A.1.28 that the mannequins "[s]hall be capable of being used to demonstrate a surgical Cricothyroidotomy").

[4]Plaintiff Laerdal Medical Corporation (Laerdal or plaintiff) states that "[t]ension pneumothorax is an abnormal collection of air or gas in the chest cavity that separates the lung from the chest wall and interferes with normal breathing."  Statement of Facts, Dkt. No. 31-1, at 10.  The court understands needle decompression of tension pneumothorax to be the insertion of a needle into the chest cavity to allow collected air or gas to escape.  See id. at 28 (stating that a mannequin simulated the physiological result of needle decompression by emitting a "hiss of air" when a needle was inserted into its chest).

with "sternal [intraosseous] acceptance sites . . . with the ability to provide fluid resuscitative treatment."[5]  Id.  The mannequins also were to "be capable of being used to demonstrate the proper procedure for insertion of an IV in brachial veins."  Id. at 1040.

Award was to be made on a best value basis, based on three factors:  Technical, Performance Risk[6] and Price.  AR 1053 (evaluation criteria); AR 1011 (RFP).  The Technical factor was to be "significantly more important than the Performance Risk" factor, and the Performance Risk factor was to be "significantly more important than" the Price factor.  AR 1053 (evaluation criteria); AR 1011 (RFP).  Award was to be made according to "an integrated tradeoff assessment among the evaluation factors and by the exercise of sound business judgment."  AR 1053 (evaluation criteria).

The solicitation stated that, with respect to the Technical factor, the government would assign each proposal one of the following five adjectival ratings (Technical ratings):

| Color | Rating | Description |
| --- | --- | --- |
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains strengths which outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Strengths and weaknesses are offsetting or will have little or no impact on contract performance.  Risk of unsuccessful performance is no worse than moderate. |

---

[5]The court understands sternal intraosseous infusion to be the infusion of fluids into the sternum when infusion into a vein or bone in a limb is not possible--for instance, due to battlefield injury.  Oral Argument of July 9, 2013 (Oral Argument), Argument of Cyrus E. Phillips, IV (Mr. Phillips) at 10:05:29-06:19 (describing sternal intraosseous infusion).  (The oral argument held on July 9, 2013 was recorded by the court's Electronic Digital Recording system (EDR).  The times noted in citations to the oral argument refer to the EDR.).

[6]Each offeror's performance risk was to be evaluated using its past performance submission.  AR 1047 (evaluation criteria).

4

| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
|--------|----------|-----|
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

Id. at 1055 (emphasis omitted). To be considered for award, offerors had to achieve a Technical rating of at least "Acceptable." Id. at 1053. This protest concerns the government's technical evaluation only.[7] See infra Part III.B-C.

The Technical ratings contemplated that the government's evaluators would weigh each offeror's strengths and weaknesses and would reject any proposal with a deficiency. See id. at 1055. Accordingly, the following definitions were implemented to facilitate evaluation under the Technical ratings:

| Significant Strength | An aspect of the Offeror's proposal that appreciably enhances the merit of the proposal or appreciably increases the probability of successful contract performance. |
|----------------------|-----|
| Strength | An aspect of the Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance. |
| Weakness | A flaw in the proposal that increases the risk of unsuccessful contract performance. |
| Significant Weakness | A flaw in the Offeror's proposal that appreciably increases the risk of unsuccessful contract performance. |
| Deficiency | A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |

---

[7]Because the parties do not contend that the Performance Risk factor or the Price factor were evaluated incorrectly, the court does not describe the evaluation of these factors.

AR 1501 (1st proposal evaluation report) (emphasis omitted); cf. FAR 15.001 (providing nearly identical definitions of the terms "deficiency," "weakness" and "significant weakness" for use in contracting by negotiation).

The government's evaluation was to "encompass two distinct events: a system [capability] demonstration . . . , and a written proposal evaluation." See AR 1011 (RFP); see also AR 1475 (technical evaluation I) (stating that the technical evaluation "consisted of product demonstrations with hands-on evaluations and a thorough review of each Offeror['s] written proposal"). In each offeror's system capability demonstration, the offeror would be given an opportunity to demonstrate "the extent to which the proposed product meets or exceeds" the seven requirements that the solicitation described as "critical requirements." AR 1055 (evaluation criteria). The government would then "perform procedures on each system in order to assess each product." Id.

As to the written proposals, the solicitation provided that the government would "evaluate the written proposals to determine the extent to which the proposed product meets or exceeds all requirements stated in the [statement of work]." AR 1022 (RFP). Offerors were also required to submit a "transmittal letter" with their written proposals, in which they were to "state that the Offeror is able to meet all requirements." AR 1045 (evaluation criteria). Offerors "[were] cautioned that while the Government will not evaluate every . . . requirement . . . for the purposes of the source selection evaluation, the awardee Contractor will be required to comply with the . . . requirements during delivery order performance." Id. at 1054; see also id. at 1044 (stating that "[t]he successful Offeror will be required to comply with all aspects of the requirements documents [including the statement of work]"). And offerors were also cautioned that the government reserved discretion to find that a mannequin did not meet the requirements-- making it ineligible for award--based solely on its evaluation of the offeror's written proposal:

> The Government may determine, at its discretion, that an Offeror's proposal is non-compliant, and therefore, ineligible for award if the proposal indicates that: it cannot or will not meet any of the . . . requirements; provides an approach that clearly does not meet any of the . . . requirements; or, includes data which prompts the Government to question the Offeror's compliance with any of the . . . requirements.

Id. at 1054; see also infra Part III.C (discussing the government's discretion in this regard).

B.      Evaluation and the Award to Laerdal

6

The government evaluated mannequins provided by plaintiff, by CAE and by two additional offerors.[8] See AR 1475 (technical evaluation I). The government assigned a Technical rating of "Unacceptable" to the mannequins submitted by the two additional offerors, which rendered the additional offerors ineligible for award. See AR 1531-32 (1st source selection decision doc.).

With respect to CAE's mannequin, the government's evaluators identified three weaknesses, two significant weaknesses and no deficiencies, certain of which are particularly relevant to this protest.[9] See AR 1477-79 (technical evaluation I). Specifically, during the system capability demonstration, CAE's mannequin did not properly simulate a reaction when needle decompression of tension pneumothorax was correctly performed on its right side (a weakness). Id. at 1477-78. The evaluators also experienced difficulty palpating the mannequin's carotid pulse and determined that two of the mannequin's other pulse sites were "anatomically incorrect" (collectively, a significant weakness). Id. at 1478. And the evaluators noted that efforts to employ a particular airway adjunct[10] were unsuccessful (a significant weakness). Id. at 1478-79. The government rated CAE's mannequin "Marginal," which rendered CAE ineligible for award. AR 1529-30 (1st source selection decision doc.).

With respect to Laerdal's mannequin, the government's evaluators identified three weaknesses, no significant weaknesses and no deficiencies. Id. at 1480-81 (technical evaluation I). Among the weaknesses was that, during Laerdal's system capability demonstration, Laerdal's mannequin did not properly simulate a reaction to a correctly performed needle decompression of tension pneumothorax on its left side. Id. at 1481. Nevertheless, the contracting officer determined that the weaknesses of Laerdal's mannequin "[were] offset by the Strengths." AR 1536 (1st source selection decision doc.). The government rated Laerdal's mannequin "Acceptable," AR 1475 (technical evaluation I), making Laerdal the only offeror eligible for award, AR 1534 (1st source selection decision doc.). The contracting officer determined that Laerdal's mannequin "[was] the best value to the government" and awarded the contract to Laerdal. Id. at 1535-36.

_____

[8]The evaluation and source selection documents refer to the offerors as "Offeror A," "Offeror B," "Offeror C" and "Offeror D." See, e.g., AR 1475 (technical evaluation I). "Offeror A" is CAE Healthcare, Inc. (CAE). AR 1564 (CAE 1st debriefing); AR 1994 (CAE 2d debriefing). "Offeror B" is Laerdal. AR 2058 (Laerdal debriefing).

[9]The parties do not challenge the strengths found in each proposal.

[10]An airway adjunct is a device that allows medical personnel to assist a patient who is unable to breathe normally. See, e.g., AR 1599-1602 (describing airway adjuncts produced by one manufacturer).

C.    The First GAO Protests and Defendant's Corrective Action

On September 14, 2012 CAE filed a bid protest with GAO, see generally AR 723-46 (CAE GAO protest I), focusing primarily on the government's technical evaluation of CAE's and Laerdal's mannequins, see id. at 732-43 (discussing the government's technical evaluation). On September 17, 2012 the government issued a stop work order to Laerdal. See AR 1594-95 (stop work order). On October 22, 2012, after receiving the agency record and other discovery documents, CAE filed a supplemental protest, again focusing on the technical evaluation of CAE's and Laerdal's mannequins. See generally AR 1773-80 (CAE GAO protest I supp.). The government informed GAO that it would take corrective action by reevaluating the mannequins, and on November 8, 2012 GAO dismissed CAE's protest and supplemental protest as academic. AR 1901 (GAO decision I).

The government reevaluated the CAE and Laerdal written proposals, and on December 4, 2012 the government conducted a second set of system capability demonstrations. AR 2363 (2d source selection decision doc.).

As to CAE's mannequin, the evaluators identified seven weaknesses, one significant weakness and no deficiencies. See AR 1934-38 (technical evaluation II). Most of the new weaknesses were identified based on CAE's written proposal. See id. at 1934-37 (describing the new weaknesses). However, of significance to this protest, during the second capability demonstration one weakness and one significant weakness that had occurred during the first capability demonstration did not recur, and two additional weaknesses were observed for the first time. See id.; see also infra Part III.B (discussing plaintiff's contentions with respect to repeatability of observations). Specifically, during the second demonstration the evaluators were able to perform needle decompression of tension pneumothorax on the right side, whereas the failure to perform such decompression had been listed as a weakness after the first demonstration. Compare AR 1477-78 (technical evaluation I) (listing failure to perform such decompression as a weakness during the first demonstration) with AR 1934-37 (technical evaluation II) (not listing failure to perform such decompression as a weakness). During the second demonstration, the evaluators were also able to employ an airway adjunct, whereas the inability of evaluators to employ an airway adjunct had been listed as a significant weakness after the first demonstration. Compare AR 1478-79 (technical evaluation I) (listing the inability of evaluators to employ an airway adjunct as a significant weakness) with AR 1937-38 (technical evaluation II) (not listing the inability of evaluators to employ an airway adjunct as a significant weakness). Further, the evaluators observed for the first time during the second demonstration that CAE's mannequin had pre-cut holes for use in simulating needle decompression of tension pneumothorax. AR 1936-37 (technical evaluation II). The evaluators determined that the pre-cut holes would prevent "realistic training" because they "reveal the answer to the trainee rather than allow the Instructor to teach and test the trainee on the proper needle chest decompression

8

procedure," which involves identifying the correct location for insertion of the needle. Id. at 1937. Finally, the evaluators observed for the first time during the second demonstration that the brachial vein was in the wrong location on CAE's mannequin, preventing proper simulation of IV therapy using the brachial vein. Id. at 1936. The government again rated CAE's mannequin "Marginal." See id. at 1938.

As to Laerdal's mannequin, the evaluators identified three weaknesses and no significant weaknesses or deficiencies. Id. at 1941-42. The three weaknesses were substantially the same as those identified after the first system capability demonstration. Compare id. with AR 1480-81 (technical evaluation I). The government again rated Laerdal's mannequin "Acceptable." AR 1943 (technical evaluation II). The contracting officer again determined that Laerdal's mannequin offered the best value to the government and selected Laerdal for award. See AR 2372 (2d source selection decision doc.).

D. The Second GAO Protests and Defendant's Corrective Action

On February 6, 2013 CAE filed a second bid protest with GAO. AR 2083 (Apr. 5, 2013 letter from Army to GAO). CAE filed supplemental protests on February 11, 2013 and March 25, 2013. Id. In a letter dated April 5, 2013, the government advised GAO as follows:

> The Army has reviewed the solicitation, the Statement of Work, and the Proposal Evaluation Report in light of Protester's supplemental protest grounds and has concluded that this solicitation should be cancelled because neither the Protester's mannequin nor Laerdal's mannequin satisfied the requirements of the solicitation and Statement of Work. The Army will re-evaluate its requirement and the availability of technology in existence to meet the requirement. It may or may not issue a new solicitation for mannequins at some point in the future as need and availability of technology occur.

Id. at 2084. The government requested that GAO dismiss the protest as academic, see id., which GAO did on April 8, 2013, AR 1930 (GAO decision II). On April 9, 2013 the government notified Laerdal by e-mail that it was terminating the contract for convenience. AR 1944-45 (termination for convenience).

Plaintiff filed this action the same day. See generally Compl. (bearing an April 9, 2013 date stamp).

On April 17, 2013 Joseph A. Giunta, Jr. (Mr. Giunta), principal assistant responsible for contracting at PEO STRI and director of the PEO STRI Acquisition Center, signed a "Memorandum for Record," explaining why he decided to take

9

corrective action after the second GAO protests by terminating Laerdal's contract for convenience.[11] AR 1954-55 (Giunta mem.) (some capitalization omitted). Mr. Giunta explained that this decision "was based upon the fact that the solicitation did not permit trade-offs within the technical evaluation factors . . . , and upon the fact that the solicitation required that the mannequins meet every one of the 49 required technical requirements to be considered for award." Id. at 1954. Mr. Giunta noted that, according to CAE's own proposal, CAE's mannequin did not comply with three of the solicitation requirements: the capacity for radio operation at a distance of 300 feet, ears that ooze simulated fluids and sternal intraosseous acceptance sites. Id. at 1954-55. Mr. Giunta also noted that, although the solicitation required each mannequin to simulate accurate responses to correctly and incorrectly performed needle decompression of tension pneumothorax, the government's evaluators were unable to perform this procedure on the left side of Laerdal's mannequin during the system capability demonstration. Id. at 1955 (Giunta mem.). Mr. Giunta stated that, "[s]ince neither of the Offerors' proposals could clearly meet the Solicitation requirements[,] I determined that the most appropriate course of action would be to terminate the contract with Laerdal for convenience and cancel the current Solicitation." Id. He intends to revise and recompete the solicitation. See id.

II.     Legal Standards

        A.      Jurisdiction

        Subject matter jurisdiction is a threshold matter that a court must determine at the outset of a case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). The United States Court of Federal Claims (Court of Federal Claims) has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract [by a federal agency] or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). In the context of a challenge to a procuring agency's corrective action, "[t]he Court of Federal Claims possesses jurisdiction to determine if a corrective action taken by an agency in response to a bid protest was reasonable under the circumstances." Centech Grp., Inc. v. United States, 79 Fed. Cl. 562, 574 (2007) (citing, inter alia, Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007)), aff'd, 554 F.3d 1029 (Fed.

_____

[11]Agency counsel represents that this decision was made by Joseph A. Giunta, Jr. (Mr. Giunta) because the contracting officer was out of the office to recover from surgery. Telephonic Status Conference (TSC) of Apr. 9, 2013, at 5:17:19-28 (Debra Talley). (The TSC held on April 9, 2013 was recorded by the court's EDR system. The times noted refer to the EDR record of the TSC). Agency counsel also represents that Mr. Giunta is the contracting officer's supervisor. See id. at 5:17:19-26. This information, however, does not appear to be in the administrative record.

Cir. 2009). A protestor must show that it has standing by meeting the "interested party" standard, that is, by showing that it (1) is an actual or prospective bidder or offeror, and (2) has a direct economic interest in the outcome of the procurement. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

### B. Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for motions for judgment on the administrative record. See RCFC 52.1(c)(1). A motion for judgment on the administrative record is "distinguish[able]" from a motion for summary judgment in that there is no requirement that all material facts be undisputed. Bannum, Inc. v. United States (Bannum), 404 F.3d 1346, 1355 (Fed. Cir. 2005); see also RCFC 52.1 rules committee notes (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). Instead, judgment on the administrative record "provide[s] for an expedited trial" on the evidence in the administrative record, permitting the court to make factual findings. See Bannum, 404 F.3d at 1356.

### C. Bid Protest Standard of Review

"The standards and criteria governing the court's review of agency decisions [on a Rule 52.1(c) motion] vary depending upon the specific law to be applied in particular cases." RCFC 52.1 rules committee notes (2006). In the bid protest context, the court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5" of the United States Code, 28 U.S.C. § 1491(b)(4), that is, under the Administrative Procedure Act standard, Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

"A bid protest proceeds in two steps." Bannum, 404 F.3d at 1351. The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. Id.; accord PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010); cf. 5 U.S.C. § 706(2)(A) (2006) (stating that the reviewing court shall set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The second step is to determine whether the error was prejudicial. Bannum, 404 F.3d at 1351.

"The arbitrary and capricious standard [applied in the first step] . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000); see also PAI Corp., 614 F.3d at 1351 ("[P]rocurement decisions are subject to a highly deferential rational basis review." (internal quotation marks omitted)). "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted).

11

This entails an examination of whether the procuring agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or reached a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The contracting officer's decision may be found to lack a rational basis, for example, if the agency "fail[ed] to follow the terms of its own Solicitation and select[ed] . . . an offeror based upon different requirements than those imposed upon [another] offeror." Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273, modified on other grounds per stipulation, 63 Fed. Cl. 141 (2004). When examining agency corrective action, the court considers whether the corrective action was "reasonable under the circumstances." Sierra Nev. Corp. v. United States, 107 Fed. Cl. 735, 750 (2012); see Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010) ("[T]his Court . . . will not object to an agency's proposed corrective action provided it is reasonable under the circumstances." (alteration and omission in original) (internal quotation marks omitted)), appeal dismissed per stipulation, 453 F. App'x 973 (Fed. Cir. 2011) (unpublished); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 (2001) (same), aff'd per curiam, 30 F. App'x 995 (Fed. Cir. 2002) (unpublished).

Technical evaluations "involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). Accordingly, a particularly high level of deference is granted to the agency's technical evaluation. L-3 Commc'ns EOTech, Inc. v. United States (L-3 EOTech), 87 Fed. Cl. 656, 664 (2009); see also Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006) ("In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations.").

To determine whether the error was prejudicial, the second step of bid protest review, the court must determine whether "there was a 'substantial chance' [that the plaintiff] would have received the contract award but for the errors" in the bid process. Bannum, 404 F.3d at 1353 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

D.    Contract Interpretation

"Contract interpretation begins with the plain language of the agreement." Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993). "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). If a solicitation contains a patent ambiguity, meaning

12

that it "contains facially inconsistent provisions," <u>Stratos Mobile Networks USA, LLC v. United States</u>, 213 F.3d 1375, 1381 (Fed. Cir. 2000), "the government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government," <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (internal quotation marks omitted).

## III.    Discussion

Plaintiff requests judgment on the administrative record as to two issues: that the system capability demonstrations conducted by the government's evaluators do not support the government's decision to take corrective action, Pl.'s Mem. 27-29; and that the government's decision to take corrective action must be set aside because it was based on a mistaken belief that the solicitation required the offerors to meet each of forty-nine numbered requirements, <u>id.</u> at 32.[12]  The court considers plaintiff's arguments in turn.

### A.      The Court Has Jurisdiction

----

[12]Plaintiff also asks the court to find that the decisions to make an award to plaintiff and to renew the award after the first GAO protests were rational. <u>See</u> Pl.'s Br. in Supp. of Mot. for J. on the AR (Pl.'s Mem.), Dkt. No. 31-2, at 30, 34.  Because the court upholds the decision to terminate plaintiff's contract, <u>see</u> <u>infra</u> Parts III-IV, it does not reach this issue.  The court notes, however, the contradiction in plaintiff's arguments.  Plaintiff contends that the government's decision to take corrective action was irrational because it was based in part on the system capability demonstrations.  <u>See</u> Pl.'s Mem. 27-29.  Yet plaintiff also contends that the award decisions were rational, <u>see</u> <u>id.</u> at 30, although they were based in part on the system capability demonstrations, <u>see</u> AR 1525-36 (1st source selection decision doc.) <u>passim</u> (referring to the first system capability demonstrations); AR 2362-72 (2d source selection decision doc.) <u>passim</u> (referring to the second system capability demonstrations).  Plaintiff was unable to explain this inconsistency at oral argument.  <u>See</u> Oral Argument of Mr. Phillips at 10:20:02-21:41.

Initially, plaintiff also contended that the government's decision to take corrective action was "unauthorized and an unlawful violation of Federal Acquisition Regulation . . . 1.602-1(a), . . . because it [was] made by [in-]house counsel at Army Materiel Command and not by the . . . Contracting Officer."  Post-Award Procurement Protest Compl., Dkt. No. 1, ¶ 5; <u>see also</u> Pl.'s Mem. 33-34 (requesting declaratory judgment that the decision to take corrective action was "unauthorized and . . . unlawful").  At oral argument, however, in response to the court's question whether plaintiff had conceded this point in light of the memorandum written by Mr. Joseph A. Giunta, Jr. (Mr. Giunta), plaintiff stated:  "Now that the Army has provided the justification [in the Giunta memorandum] . . . .  I think the Army is entitled to the benefit of the assumption that it just took a while for the documentation to catch up to the decision."  <u>See</u> Oral Argument of Mr. Phillips at 10:19:15-49.  Therefore, the court understands plaintiff to have withdrawn this argument.

13

Subject matter jurisdiction is a threshold matter that a court must determine at the outset of a case. See Steel Co., 523 U.S. at 94-95. In the context of a challenge to a procuring agency's corrective action, "[t]he Court of Federal Claims possesses jurisdiction to determine if a corrective action taken by an agency in response to a bid protest was reasonable under the circumstances." Centech Grp., Inc., 79 Fed. Cl. at 574. A protestor must show that it has standing by meeting the "interested party" standard, that is, by showing that it (1) is an actual or prospective bidder or offeror, and (2) has a direct economic interest in the outcome of the procurement. Rex Serv. Corp., 448 F.3d at 1307. Defendant does not contend that the court lacks jurisdiction to hear plaintiff's claims, presumably because the facts of this case lend themselves to a finding that jurisdiction in this court is proper. Specifically, in this action, plaintiff challenges the government's corrective action, see Compl. ¶ 1, making this court's jurisdiction proper, cf. Centech Grp., Inc., 79 Fed. Cl. at 574. In addition, plaintiff has standing because, as the awardee of the contract terminated by the government's corrective action, see Compl. ¶ 1, plaintiff is an actual offeror with a direct economic interest in the outcome of the procurement, cf. Rex Serv. Corp., 448 F.3d at 1307.

B.      The Army's Reliance on the System Capability Demonstrations Was
        Reasonable

Mr. Giunta's decision to take corrective action was based in part on the evaluators' observation, during the system capability demonstrations, that Laerdal's mannequin did not meet the requirement to "simulate human responses to both correctly and incorrectly performed needle decompression procedures." See AR 1955 (Giunta mem.) (internal quotation marks omitted); cf. AR 1039 (statement of work) (stating same); see also supra Part I.B-C (describing the system capability demonstrations).

Plaintiff contends that the system capability demonstrations do not support the government's decision to take corrective action because they were flawed in two respects. Pl.'s Mem. 27-29. First, the evaluators made somewhat different observations in the two demonstrations. See id. In the first demonstration, the evaluators were unable to use a particular airway adjunct with CAE's mannequin, which they determined was a significant weakness. See id. at 27; supra Part I.B (describing the first demonstration). In the second demonstration, the evaluators were able to use the airway adjunct, but noticed that CAE's mannequin had pre-cut holes for insertion of the needle used in simulated decompression of tension pneumothorax. Pl.'s Mem. 27-28; supra Part I.C (describing the second demonstration). Because the pre-cut holes would "not allow for realistic training," the evaluators assigned CAE's mannequin an additional weakness. See AR 1936-37 (technical evaluation II). The evaluators also observed that the brachial vein was in the wrong location on CAE's mannequin, which would not allow correct training on IV infusion, and assigned CAE another weakness on this basis. Id. at 1936. Plaintiff contends that "Occam's razor, his theory of parsimony, demands repeatable

14

observations," and that "[w]ithout repeated observations of the same phenomenon, any conclusions are random, and therefore . . . irrational."[13]  Pl.'s Mem. 28.

Second, plaintiff contends, the system capability demonstrations were flawed because "[s]ome of PEO-STRI's Technical Evaluators were more skilled, others less so-- and some were more recently experienced conducting the seven required procedures." Id.  Paraphrasing the declaration of one of plaintiff's employees, Jimmy Glover (Mr. Glover), plaintiff states that some of the government's evaluators found the difficulty other evaluators experienced in conducting the procedures "laughable."  See id.  The relevant portion of Mr. Glover's declaration states that he was present during the second system capability demonstration, see AR 2080 (Glover decl.), and describes the evaluators' levels of skill as follows:

> It was obvious to me and to numerous evaluators[] that some of the evaluators were either more skilled or that some were more recently practiced than other evaluators.  Some of the evaluators actually joked at the difficulties some other evaluators were having at performing the prescribed procedure.  Those difficulties were most obvious when some were handling and using the various airway adjuncts, performing a clinically correct surgical cricothyroidotomy, correctly palpating the site for and inserting a needle for chest decompression, and in correctly performing an IV in a brachial vein.  While some had these difficulties, other evaluators were able to perform all of the required skills and procedures effortlessly.

id. at 2082; see also id. (stating that Mr. Glover is an employee of Laerdal).

"The arbitrary and capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc., 216 F.3d at 1058.  In particular, the contracting agency's technical evaluation "involve[s] discretionary determinations of procurement officials that a court will not second guess," E.W. Bliss Co., 77 F.3d at 449, and is entitled to a high level of deference, L-3 EOTech, 87 Fed. Cl. at 664; see also Fort Carson, 71 Fed. Cl. at 586 (similar).  When examining agency corrective action, the court

---

[13]Plaintiff does not define Occam's razor but cites Wikipedia, see Pl.'s Mem. 28, which provides the following definition:  "Occam's razor . . . is a principle of parsimony, economy, or succinctness used in logic and problem-solving.  It states that among competing hypotheses, the hypothesis with the fewest assumptions should be selected."  Occam's razor, Wikipedia, http://en.wikipedia.org/wiki/Occam%27s_razor (last visited July 19, 2013).  Wikipedia does not state that Occam's razor requires results to be repeatable.  At oral argument, plaintiff stated-- without citation to authority--that the requirement of repeatability is "[a] common principle of science."  Oral Argument of Mr. Phillips at 10:11:10-14.

considers whether the corrective action was "reasonable under the circumstances." Sierra Nev. Corp., 107 Fed. Cl. at 750; see Sheridan Corp., 95 Fed. Cl. at 151 (similar).

Applying this standard, the court finds plaintiff's first argument--that the results of the two system capability demonstrations were "random" and "irrational" because they differed, see Pl.'s Mem. 28--unpersuasive. Plaintiff cites no case in which retesting of products by a procuring agency was found invalid because the second test yielded a different outcome than the first test. Instead, it appears reasonable to the court that, upon retesting the mannequins, the evaluators might observe features that had previously escaped their notice and succeed in using an airway adjunct they had been unable to employ during the previous system capability demonstration. Such differences appear to the court to reflect not random or arbitrary results but rather the results of additional observation of the mannequins and greater familiarity with their use. Cf. Advanced Data Concepts, Inc., 216 F.3d at 1058; E.W. Bliss Co., 77 F.3d at 449; Sierra Nev. Corp., 107 Fed. Cl. at 750.

With respect to plaintiff's second contention--that certain of the government's evaluators were less qualified than others, Pl.'s Mem. 28--"[t]he composition of an agency's evaluation team is a matter in which the agency has great discretion," Software Eng'g Servs., Corp. v. United States (Software Eng'g), 85 Fed. Cl. 547, 556 (2009); accord Chenega Mgmt., LLC. v. United States, 96 Fed. Cl. 556, 587 (2010). Accordingly, if "the expertise of the evaluators is unrelated to bad faith, conflict of interest, or bias, this Court will not question the composition of the technical evaluation team." Software Eng'g, 85 Fed. Cl. at 557. Because plaintiff has not alleged bad faith, a conflict of interest or bias on the part of the evaluators, the court will not question the qualifications of the government's evaluators. Cf. id.

The court therefore concludes that Mr. Giunta's decision to take corrective action was not unreasonable under the circumstances because of his reliance on the system capability demonstrations or on evaluators whose qualifications plaintiff questions.[14] Cf. Sierra Nev. Corp., 107 Fed. Cl. at 750; Sheridan Corp., 95 Fed. Cl. at 151.

---

[14]Plaintiff also contends that the determination by Mr. Giunta to terminate the contract for convenience was "arbitrary or capricious" because the memorandum in which he memorialized the decision did not "demonstrate[] consideration of all the facts." Pl.'s Br. in Supp. of Pl.'s Opp'n to Def.'s Cross-Mot. for J. on the AR (Pl.'s Resp.), Dkt. No. 42-2, at 29; see also Pl.'s Mem. 33 (requesting declaratory judgment based on an alleged lack of consideration of relevant facts). Specifically, plaintiff contends, Mr. Giunta failed to consider the fact that Laerdal's written proposal stated that its mannequin was capable of simulating needle decompression of tension pneumothorax on both sides of the body and that Laerdal's employees were able to perform this procedure during the system capability demonstrations. See Pl.'s Resp. 29.

C.  The Solicitation Required Compliance with the Forty-Nine Numbered
Requirements

In his memorandum, Mr. Giunta stated that his decision to terminate Laerdal's contract was based, in part, "upon the fact that the solicitation required that the mannequins meet every one of the 49 required technical requirements to be considered for award."  AR 1954 (Giunta mem.).  In Mr. Giunta's view, the solicitation did not allow tradeoffs to be made between a proposal's strengths and its failures to meet solicitation requirements.  See id.; see also supra Part I.B-C (describing the contracting officer's tradeoff analysis).  Mr. Giunta noted that, according to CAE's own proposal, CAE's mannequin did not comply with three of the solicitation's requirements:  the capacity for radio operation at a distance of 300 feet, ears that ooze simulated fluids and sternal intraosseous acceptance sites.  AR 1954-55 (Giunta mem.).  Mr. Giunta also noted that, although the solicitation required each mannequin to simulate responses to correctly and incorrectly performed needle decompression of tension pneumothorax, the government's evaluators were unable to perform this procedure on the left side of Laerdal's mannequin during the system capability demonstrations.  Id. at 1955; see also supra Part I.B (describing the contracting officer's determination that Laerdal's mannequin did not perform this function).  Mr. Giunta stated that, "[s]ince neither of the Offerors' proposals could clearly meet the Solicitation requirements[,] I determined that the most appropriate course of action would be to terminate the contract with Laerdal for convenience and cancel the current Solicitation."  AR 1955 (Giunta mem.).

Relying on the proposition that a procurement decision "based on irrelevant factors . . . is arbitrary" and must be set aside, plaintiff contends that Mr. Giunta's decision to terminate Laerdal's contract was arbitrary and must be set aside because it was based on his incorrect belief that the solicitation required the mannequins to comply with each of the forty-nine requirements.  See Pl.'s Mem. 32-33 (citing Advanced Data Concepts, Inc., 216 F.3d at 1058).  Rather than requiring offerors to meet each technical requirement, plaintiff continues, the solicitation granted the contracting officer "discretion to decide which, if any, of the forty-nine specific requirements for the . . . mannequins would be disqualifying."  Id. at 32 (emphasis omitted).  As support for its position, plaintiff quotes the following passage of the solicitation:

_____

Mr. Giunta's reliance on the evaluators' observations was consistent with the evaluation framework set out in the solicitation, pursuant to which--regardless of the offerors' claims in their written proposals--certain of each mannequin's capabilities were to be assessed directly by the government's evaluators after demonstration by the offeror's employees.  Cf. AR 1055 (evaluation criteria) (stating that, during the system capability demonstrations, "the Government will perform procedures on each system in order to assess each product").  Therefore, no explanation was required for Mr. Giunta's reliance on the evaluators' observations.

17

> The Government may determine, at its discretion, that an Offeror's proposal is non-compliant, and therefore, ineligible for award if the proposal indicates that: it cannot or will not meet any of the [statement of work] . . . requirements; provides an approach that clearly does not meet any of the [statement of work] . . . requirements; or, includes data which prompts the Government to question the Offeror's compliance with any of the [statement of work] . . . requirements.

Id. at 10 (emphasis and internal quotation marks omitted); cf. AR 1054 (evaluation criteria) (stating same).

Plaintiff further contends that the solicitation created a "scheme where observed 'Strengths' and 'Weaknesses' could be offset, one against the other." Pl.'s Resp. 28; see Oral Argument of July 9, 2013 (Oral Argument), Argument of Cyrus E. Phillips, IV at 10:24:19-31 ("The solicitation provides a rating scheme where you trade off what capabilities you comply with with which capabilities you can't and what additional capabilities you offer."). "What would be the point," plaintiff asks, "of the adjectival ratings set out in the [solicitation] if all that was required was a check-list for the forty-nine capabilities listed in the Statement of Work?" Pl.'s Resp. 30-31. Plaintiff further asserts that "'[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.'" Id. at 31 (alteration in original) (quoting Restatement (Second) of Contracts § 202 (1981)). Plaintiff argues that the contracting officer's decisions to award the contract to Laerdal and to award the contract to Laerdal again after the first GAO protests formed a course of conduct suggesting that "a single non-compliance with [the forty-nine requirements] set out . . . in [the] Statement of Work was not automatically disqualifying." Id. at 31-32.

Defendant responds that "offerors were required to meet all the requirements of the Solicitation--including the 49 specific requirements enumerated in . . . the [statement of work]--and neither Laerdal nor CAE met all of the requirements." Def.'s Mot. 14. Defendant contends that the evaluation process resulting in the awards to Laerdal was flawed and suggests that "the genesis of the problem" was that the evaluators incorrectly classified failures to meet solicitation requirements as "weaknesses," which could be offset by strengths, instead of defining them as "deficiencies," a mistake the contracting officer failed to correct. See Oral Argument of Michael D. Snyder (Mr. Snyder) at 10:50:14-37; cf. AR 1501 (1st proposal evaluation report) (defining a "Weakness" as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance" and a "Deficiency" as including "[a] material failure of a proposal to meet a Government requirement"); AR 1055 (evaluation criteria) (allowing for tradeoffs between strengths and weaknesses but stating that a proposal "contain[ing] one or more deficiencies" is "unawardable"). According to defendant, the Army "erroneously engaged in 'trade-off' analysis[] [when awarding the contract to Laerdal although] neither CAE nor Laerdal met

18

the 49 requirements." Def.'s Mot. 16. Because the resulting awards to Laerdal were incorrectly made, defendant argues, "cancelation of the solicitation was appropriate." Def.'s Reply 4; see also Oral Argument of Mr. Snyder at 10:25:25-34 ("The Army acted rationally and reasonably by canceling this solicitation . . . . The Army would have acted irrationally and unreasonably if it had not done so.").

"The arbitrary and capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc., 216 F.3d at 1058; see also PAI Corp., 614 F.3d at 1351 (similar). However, the contracting officer's decision may be found to lack a rational basis if the agency "fail[ed] to follow the terms of its own Solicitation." Hunt Bldg. Co., 61 Fed. Cl. at 273. When examining agency corrective action, the court considers whether the corrective action was "reasonable under the circumstances." Sierra Nev. Corp., 107 Fed. Cl. at 750; see Sheridan Corp., 95 Fed. Cl. at 151 (similar). In this case, whether the government's corrective action should be sustained depends on interpretation of the solicitation. Interpretation of a solicitation "begins with the plain language of the [solicitation]." See Foley Co., 11 F.3d at 1034. "When interpreting the [solicitation], the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." See NVT Techs., Inc., 370 F.3d at 1159.

The court agrees with defendant that the plain language of the solicitation required the mannequins to comply with each of the forty-nine requirements. Cf. Foley Co., 11 F.3d at 1034 (stating that interpretation of a solicitation "begins with the plain language of the [solicitation]"). First, the Technical ratings set out in the solicitation were defined in such a manner that an offeror who did not meet all of the requirements was ineligible for award. Specifically, a proposal that "[did] not clearly meet [the] requirements" was to be rated "Marginal," AR 1055 (evaluation criteria), and therefore ineligible for award, see id. at 1053 (defining eligibility). A proposal that "[did] not meet [the] requirements and contain[ed] one or more deficiencies," was to be rated "Unacceptable," AR 1055 (evaluation criteria), and therefore ineligible for award, see id. at 1053; see also AR 1501 (1st proposal evaluation report) (defining a deficiency, in part, as "[a] material failure of a proposal to meet a Government requirement"). The three Technical ratings making a proposal eligible for award, see AR 1053 (evaluation criteria) (defining eligibility)-- "Outstanding," "Good" and "Acceptable"--could only be assigned to proposals that "me[t] [the] requirements," id. at 1055. The solicitation contemplated that strengths would be weighed against weaknesses to arrive at a Technical rating. See id. For instance, if a proposal's "[s]trengths far outweigh [its] weaknesses," the proposal was to be rated "Outstanding." Id. However, at no point did the solicitation suggest that a

strength could be weighed against a deficiency, such as a failure to meet solicitation requirement.[15]

Consistent with this evaluation framework, the solicitation repeatedly stressed that offerors were required to meet each of the solicitation requirements. Specifically, the solicitation stated that the mannequins "shall include" the forty-nine numbered requirements. AR 1037 (statement of work) (emphasis added); see also id. at 1026 (stating that the awardee "shall deliver [mannequins] that meet the requirements as defined in this [statement of work]--including the [forty-nine numbered] Requirements"). The solicitation also required offerors to send a transmittal letter, which was to "state that the Offeror is able to meet all requirements," AR 1045 (evaluation criteria), and "cautioned" offerors that, "while the Government will not evaluate every [statement of work] . . . requirement . . . , the awardee Contractor will be required to comply with the [statement of work] . . . requirements during delivery order performance," id. at 1054; see also id. at 1044 (stating that "[t]he successful Offeror will be required to comply with all aspects of the requirements documents," including the statement of work). Additionally, it stated that, during the technical evaluation, "[t]he evaluators [would] evaluate the written proposals to determine the extent to which the proposed product meets or exceeds all requirements stated in the [statement of work]." Id. at 1056 (emphasis added).

Contrary to plaintiff's view, the solicitation provision upon which plaintiff relies, see Pl.'s Mem. 10 (citing the evaluation criteria provision discussing the government's discretion to reject a proposal as noncompliant), is also consistent with an evaluation framework in which offerors had to meet each of the forty-nine requirements,[16] cf. NVT Techs., Inc., 370 F.3d at 1159 (stating that a contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts"). The

---

[15]At oral argument, defendant provided the following example of how weaknesses and the requirements might interact: "You could technically meet a requirement but still have a weakness with respect to that requirement. Perhaps technically you can perform a certain task, but you are concerned that the durability of that component of the mannequin is weak and it could break easily." Oral Argument of Michael D. Snyder at 10:27:55-28:10.

[16]To the extent that plaintiff may believe that the reference to the government's discretion rendered the solicitation ambiguous as to whether a contractor was required to meet the forty-nine numbered requirements, plaintiff was required to seek clarification from the government before the close of bidding. Cf. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (stating that, under the doctrine of patent ambiguity, "where a government solicitation contains a patent ambiguity, the government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government" (internal quotation marks omitted)); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.").

20

solicitation's reference to the government's discretion in its statement that "[t]he Government may determine, at its discretion, that an Offeror's proposal is non-compliant, and therefore, ineligible for award," AR 1054 (evaluation criteria), did not allow the contracting officer to waive solicitation requirements. Instead, it described the contracting officer's discretion to find that a mannequin did not meet the requirements, making it ineligible for award, based solely on his evaluation of the offeror's written proposal. Cf. id.; see also id. at 1056 ("The evaluators will evaluate the written proposals to determine the extent to which the proposed product meets or exceeds all requirements stated in the [statement of work]."). The solicitation provision relied upon by plaintiff then described the bases upon which the contracting officer could exercise his discretion in finding a proposal noncompliant: the written proposal indicated that the offeror "cannot or will not meet any of the [statement of work] . . . requirements; provides an approach that clearly does not meet any of the [statement of work] . . . requirements; or, includes data which prompts the Government to question the Offeror's compliance with any of the [statement of work] . . . requirements." Id. at 1054. Plaintiff's contention that this provision granted the contracting officer "discretion to decide which, if any, of the forty-nine specific requirements for the . . . mannequins would be disqualifying," Pl.'s Mem. 32 (emphasis omitted), is incorrect.

The court therefore concludes that the government did not "fail[] to follow the terms of its own Solicitation" by determining that award could not be made to offerors who did not meet each of the solicitation requirements. Cf. Hunt Bldg. Co., 61 Fed. Cl. at 273. Instead, because the solicitation required offerors to meet each of the forty-nine numbered requirements, the government's decision to terminate Laerdal's contract for convenience owing to its failure to meet all of the requirements was "reasonable under the circumstances." Cf. Sierra Nev. Corp., 107 Fed. Cl. at 750; Sheridan Corp., 95 Fed. Cl. at 151.

IV.     Conclusion

For the foregoing reasons, the government's decision to take corrective action by terminating plaintiff's contract for convenience was "reasonable under the circumstances," see supra Part III.B (finding reasonable the Army's reliance on the system capability demonstrations as a basis for canceling the contract), III.C (finding reasonable the government's decision to cancel the contract because no offeror complied with all forty-nine numbered requirements), and consistent with the terms of the solicitation, see supra Part III.C (finding that the solicitation required compliance with all forty-nine numbered requirements). The court therefore holds that the corrective action was not arbitrary or capricious, without a rational basis or contrary to law. Cf. Advanced Data Concepts, Inc., 216 F.3d at 1058 (stating that, under the "highly deferential" arbitrary and capricious standard, a reviewing court must "sustain an agency determination evincing rational reasoning and consideration of relevant factors"); PAI Corp., 614 F.3d at 1351 (similar). Further, because the court finds that the corrective

21

action did not constitute an error by the government, plaintiff suffered no prejudice.  Cf. Bannum, 404 F.3d at 1351 (requiring an error as a prerequisite to the court's prejudice determination).

Plaintiff's Motion is DENIED and defendant's Motion is GRANTED.  The Clerk of Court shall ENTER JUDGMENT in favor of defendant and defendant-intervenor, dismissing plaintiff's claims with prejudice.

No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

22